1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Colin Kelly (Bar No. 266956)
        Email: colin@iewaterkeeper.org
6876 Indiana Avenue, Suite D
Riverside, California 92506
Telephone: (951) 530-8823
Facsimile: (951) 530-8824

*Attorney for Plaintiff*
INLAND EMPIREWATERKEEPER and ORANGE COUNTY COASTKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a program of ORANGE COUNTY COASTKEEPER; ORANGE COUNTY COASTKEEPER, a California non-profit corporation,<br><br>             Plaintiffs,<br><br>     vs.<br><br>MISSION CLAY PRODUCTS, LLC, a California Limited Liability Company; MC INDUSTRIES, LLC, a California Limited Liability Company; MCP INDUSTRIES, INC., a California Corporation; BBG KRG, INC., a California Corporation.<br><br>             Defendants. | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)** |

Complaint                                    1

Inland Empire Waterkeeper and Orange County Waterkeeper (collectively "Waterkeeper" or "Plaintiffs"), by and through its counsel, hereby allege:

## I.     JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On April 16, 2014, Waterkeeper issued a 60-day notice letter ("Notice Letter") to Mission Clay Products, LLC, MC Industries, LLC, MCP Industries, Inc., BBG KRG, Inc. (hereinafter collectively referred to as "Mission Clay" or "Defendants") for their violations of the Clean Water Act. The Notice Letter was also sent to the registered agent for defendants as required by 40 C.F.R. § 135.2(a)(2). The Notice Letter was sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Regional Board") as required by CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as Exhibit A and is incorporated herein by reference.

3.     More than sixty days have passed since the Notice Letter was served on Defendants and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this complaint under Section 301(b)(1)(B) of the CWA. 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to Section

505(c)(1) of the CWA, because the sources of the violations are located within this judicial district. 33 U.S.C. § 1365(c)(1).

## II.   **INTRODUCTION**

5.    This complaint seeks relief for the Defendants' unlawful discharges of pollutants into waters of the United States from their operations at 23835 Temescal Canyon Road ("the Facility"). Specifically, Defendants' discharges from the Facility into storm drains, Temescal Creek, the Santa Ana River, and the Pacific Ocean (collectively referred to as the "Receiving Waters"), Defendants' violations of the filing, monitoring and reporting requirements, Defendants' violations of the discharge and management practice requirements, and Defendants' violations of other procedural and substantive requirements of California's Industrial Permit for Discharges Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) (hereinafter "Storm Water Permit") and the CWA are ongoing and continuous violations of the Clean Water Act and the Storm Water Permit.

6.    With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into the Receiving Waters. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering the marine and river environments each year. The Receiving Waters are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, the Receiving Waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals and other pollutants harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities. The public's use of the Receiving Waters for water contact sports exposes many people to toxic metals and other

contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

**III.     PARTIES**

    **A.     Inland Empire Waterkeeper and Orange County Coastkeeper**

7.     Inland Empire Waterkeeper is a program of Orange County Coastkeeper. Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506.

8.     Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

9.     Together, Inland Empire Waterkeeper and Orange County Coastkeeper have over 2,000 members who live and/or recreate in and around the Santa Ana River watershed. Coastkeeper, and its project, Waterkeeper, are dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of Inland Empire area surface waters. To further these goals, Waterkeeper actively seeks Federal and State agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and others.

10.     Waterkeeper members use and enjoy the Receiving Waters into which polluted storm water and non-storm water from the Facility is discharged.

11.     Waterkeeper members use and enjoy the Receiving Waters for fishing, boating, swimming, bird watching, picnicking, viewing wildlife, sailing, kayaking, hiking, and engaging in scientific study including monitoring activities.

12.     Discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Receiving Waters, and impair each of Waterkeeper's members' uses.

13.     The Facility's polluted discharges are ongoing and continuous. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely

affected by the Facility owners' and/or operators' failure to comply with the Clean Water Act and the Storm Water Permit.

**B.    The Facility Owners and/or Operators**

14.    Waterkeeper is informed, and believes, and thereon alleges that Mission Clay Products, LLC is an owner and/or operator of the Facility.

15.    Waterkeeper is informed, and believes, and thereon alleges that MC Industries, LLC is an owner and/or operator of the Facility.

16.    Waterkeeper is informed, and believes, and thereon alleges that MCP Industries, Inc. is an owner and/or operator of the Facility.

17.    Waterkeeper is informed, and believes, and thereon alleges that Mission Clay Products, LLC is a subsidiary of MC Industries, LLC.

18.    Waterkeeper is informed, and believes, and thereon alleges that MC Industries, LLC is a subsidiary of MCP Industries, Inc.

19.    Waterkeeper is informed, and believes and thereon alleges that BBG KRG, Inc. is an owner and/or operator of the Facility.

20.    Waterkeeper is informed, and believes, and thereon alleges that Mission Clay Products, LLC is an active limited liability company registered in California.

21.    Waterkeeper is informed, and believes, and thereon alleges that MC Industries, LLC is an active limited liability company registered in California.

22.    Waterkeeper is informed, and believes, and thereon alleges that MCP Industries, Inc. is an active corporation registered in California.

23.    Waterkeeper is informed, and believes, and thereon alleges that BBG KRG, Inc. is an active corporation registered in California.

24.    Waterkeeper is informed, and believes, and thereon alleges that the Registered Agent for Mission Clay Products, LLC and MC Industries, LLC, Inc. is CT Corporation System, 818 West Seventh Street, Los Angeles, California 90017.

25.    Waterkeeper is informed, and believes, and thereon alleges that the Registered Agent for MCP Industries, Inc. is Jack J. Barcal, 1301 East Road, La Habra

Heights, California 90631.

26.     Waterkeeper is informed, and believes, and thereon alleges that the Registered Agent for BBG KRG, Inc. is John J. Barcal, 1301 East Road, La Habra Heights, California 90631.

27.     Waterkeeper hereinafter refers to MC Industries, LLC, MCP Industries, Inc., Mission Clay Products, LLC, and BBG KRG, Inc. collectively as "Facility Owners and/or Operators."

## IV.     LEGAL BACKGROUND

### A.     The Clean Water Act and California's Storm Water Permit

28.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

29.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); see 40 C.F.R. § 122.26(c)(1).

30.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); see 40 C.F.R. § 122.2.

31.     The "discharge of a pollutant" means, among other things, the addition of a pollutant to "waters of the United States" from any "point source." 40 C.F.R. § 122.2.

32.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C.

§ 1362(14); *see* 40 C.F.R. § 122.2.

33.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

34.     The EPA promulgated regulations for Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.  *Id.*

35.     The CWA confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdburg*, 496 F.3d 993 (9th Cir. 2007). A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

36.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, at 782; *N. Cal. River Watch*¸ 496 F.3d at 1000-1001.

37.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

38.     Section 402(p) of the CWA, 33 U.S.C. § 1342(p), establishes a framework for regulating industrial storm water discharges under the NPDES program. States with

approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a single, statewide general NPDES permit applicable to all industrial storm water dischargers.  *Id.*

39.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation… or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), and 1365(f).

40.     The term "person" means "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

41.     Mission Clay Products, LLC is a "person" within the meaning of section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

42.     MC Industries, LLC is a "person" within the meaning of section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

43.     MCP Industries, Inc. is a "person" within the meaning of section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

44.     BBG KRG, Inc. is a "person" within the meaning of section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

45.     An action for injunctive relief is authorized under section 505(a) of the CWA, 33 U.S.C. § 1365(a).

46.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day for violations occurring after January 12, 2009. 33 U.S.C. § 1319(d); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

47.     Section 505(d) of the Clean Water Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. 33 U.S.C. § 1365(d).

**B.     California's Storm Water Permit**

48.     In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

49.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to section 402 of the CWA. 33 U.S.C. § 1342(b); *see also* 40 C.F.R § 123.25 (2005).

50.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Finding #2.

51.     Violations of the Storm Water Permit are also violations of the CWA. *See* Storm Water Permit Section C(1) (Standard Provisions).

**C.     Obtaining Coverage Under the NPDES Permit**

52.     Each Facility that must obtain coverage under the NPDES Permit must submit a Notice of Intent ("NOI") by mailing a site map and an NOI form to the State Water Resources Quality Control Board.  *See* Storm Water Permit, Attachment 3.

53.     Facilities that must obtain coverage under the NPDES Permit include Mineral Mining and Processing facilities and Manufacturing Facilities (Standard Industrial Code or "SIC" codes begin with 32). *See* Storm Water Permit, Attachment 1.

54.     Waterkeeper is informed and believes that industrial activities that take place at the Facility include clay tile manufacturing and clay mining (mineral mining).

55.     The Facility Information Section of the NOI must state the total size of the facility in acres or square feet. *See* Storm Water Permit, Attachment 3.

56.     The Facility Information Section of the NOI also must include the appropriate the appropriate SIC Code that best describes the industrial activity that takes place at the facility.  Facilities that have more than one industrial activity should list more than one SIC Code.  *See* Storm Water Permit, Attachment 3.

### D.  The Storm Water Permit's Effluent Limitations, Receiving Water Limitations, and Discharge Prohibitions

57.  Except as authorized by the Storm Water Permit, Discharge Prohibition A(1) of the Storm Water Permit prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. *See* Storm Water Permit, Discharge Prohibition A(1).

58.  Effluent Limitation (B)(3) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include total suspended solids ("TSS"), oil and grease, pH, biochemical oxygen demand, and fecal coliform.  Nonconventional pollutants include any pollutant not listed as a conventional pollutant or toxic pollutant.

59.  Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment.

60.  Receiving Water Limitation C(2) of the Storm Water Permit prohibits storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

61.  Water Quality Standards ("WQS") are pollutant concentration levels, expressed numerically or as a narrative, that the State Board, the various Regional Boards, and the EPA have determined to be protective of the beneficial uses of the waters that receive polluted discharges.

62.     The Water Quality Control Plan for the Santa Ana River Basin (Basin Plan), California Regional Water Quality Control Board, Santa Ana Region, 3rd Ed., (Rev. June 2011) ("Basin Plan") identified the "Beneficial Uses" of water bodies in the region. The existing and/or potential Beneficial Uses for Temescal Creek include, at a minimum: Agricultural Supply (AGR); Industrial Service Supply (IND); Groundwater Recharge (GWR); Water Contact Recreation (REC 1); Non-contact Water Recreation (REC 2); Limited Warm Freshwater Habitat (LWRM); and Wildlife Habitat (WILD). The Basin Plan Beneficial Uses for Reach 3 of the Santa Ana River include: as Agricultural Supply (AGR), Groundwater Recharge (GWR); Water Contact Recreation (REC 1); Non-contact Water Recreation (REC 2); Warm Freshwater Habitat (WARM); Wildlife Habitat (WILD); and Rare, Threatened or Endangered Species (RARE). *See* Basin Plan at Table 3-1.

63.     Discharges of pollutants at levels above WQS contribute to the impairment of the beneficial uses of the waters receiving the discharges.

64.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act. According to the 2010 303(d) List of Impaired Water Bodies, Reach 3 of the Santa Ana River is impaired for copper.[1] Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic dependent wildlife.

65.     The Basin Plan includes a narrative standard prohibiting discharges that "result in coloration of the receiving waters which causes a nuisance or adversely affects beneficial uses." *See* Basin Plan at 4-10.

66.     The Basin Plan also includes a narrative standard prohibiting discharges that "contain floating materials, including solids, liquids, foam or scum, which cause a

---

[1] 2010 Integrated Report – All Assessed Waters, available at: http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml, (last accessed on June 23, 2014).

Complaint                                    11

1   nuisance or adversely affects beneficial uses." *See* Basin Plan at 4-11.

2       67.    The Basin Plan also includes a narrative standard prohibiting discharges

3   containing "suspended or settleable solids in amounts which cause a nuisance or

4   adversely affect beneficial uses as a result of controllable water quality factors." *See*

5   Basin Plan at 4-16.

6       68.    The Basin Plan also includes a narrative standard prohibiting discharges that

7   cause "changes in turbidity which adversely affect beneficial uses." *See* Basin Plan at 4-

8   18.

9       69.    WQS applicable to discharges covered by the Storm Water Permit include,

10  but are not limited to, those set out in Basin Plan and in the Criteria for Priority Toxic

11  Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38 (2009).

12      70.    The CTR numeric criteria are set to protect human health and the

13  environment in the state of California.[2]

14      71.    EPA Benchmarks are the pollutant concentrations above which EPA has

15  determined represent a level of concern indicating that a facility has not successfully

16  developed or implemented Best Management Practices ("BMPs") that meet BAT for

17  toxic pollutants and BCT for conventional pollutants. Final Reissuance of National

18  Pollutant Discharge Elimination System (NPDES) Storm Water Multi-Sector General

19  Permit for Industrial Activities, 65 Fed. Reg. 64766 (October 30, 2000) ("2000 MSGP

20  Permit"); Final National Pollutant Discharge Elimination System (NPDES) General

21  Permit for Stormwater Discharges From Industrial Activities, 73 Fed. Reg. 56572

22  (September 29, 2008) ("2008 MSGP Permit").

23      72.    The EPA Benchmark values provide an objective level to determine whether

24  a facility's storm water pollution prevention measures are successfully implemented.

25  2000 MSGP Permit at 64766-67; 2008 MSGP Permit at 56574.

26

27  ───────────────
    [2] Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic

28  Pollutants for the State of California Factsheet, EPA-823-00-008, April 2000 available at
    http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

Complaint                                    12

73.     Discharges with pollutant levels that exceed EPA Benchmark values indicate BMPs are not developed and/or implemented to achieve BAT/BCT in violation of Effluent Limitation B(3). *See* 2008 MSGP Permit at 56574

74.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation C(1) of the Storm Water Permit.

75.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the Storm Water Permit.

76.     Receiving Water Limitations C(3) and C(4) of the Storm Water Permit require a permittee whose discharge exceeds the Storm Water Permit Receiving Water Limitations to submit a written report identifying what additional BMPs will be implemented to achieve water quality standards.

77.     Unauthorized discharges of materials other than storm water (non-storm water) are violations of Discharge Prohibition A(1) of the Storm Water Permit.

C.      **The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

78.     Section A(1) and Provision E(2) of the Storm Water Permit require dischargers to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") that complies with the requirements of the Storm Water Permit prior to commencing industrial activities.

79.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section A(2).

80.     Section A(4) of the Storm Water Permit requires that the SWPPP include a site map that contains: the facility boundaries, storm water drainage areas and directions

Complaint                              13

of flow for each drainage area, on-site surface water bodies, nearby water bodies, areas of soil erosion, and municipal storm drain inlets where the facility's storm water discharges may be received (Section A(4)(a)); the location of the storm water collection, conveyance and discharge system and structural control measures that affect storm water discharges (Section A(4)(b)); an outline of all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures (Section (4)(c)); locations where materials are directly exposed to precipitation and where significant spills or leaks have occurred (Section A(4)(d)); and areas of industrial activity, including areas that are actual and potential pollutant sources (Section A(4)(e)).

81.     Section A(5) of the Storm Water Permit requires that the SWPPP include a list of significant materials handled and stored at the site.

82.     Section A(6)(a) of the Storm Water Permit requires that the SWPPP include a narrative description of the facility's industrial activities, associated potential pollutant sources, and potential pollutants that could be discharged in storm water discharges. At a minimum, the discharger must consider industrial processes, material handling and storage areas, dust and particulate generating activities, significant spills and leaks, and locations where soil erosion may occur. Storm Water Permit, Section A(6)(a)(i)-(vi).

83.     Section A(6)(b) of the Storm Water Permit requires that the SWPPP include a summary of all areas of industrial activities, potential pollutant sources, and potential pollutants.

84.     Section A(7)(a) of the Storm Water Permit requires that the SWPPP include a narrative assessment of all industrial activities and potential pollutant sources to determine which areas of the facility are likely sources of pollutants and which pollutants are likely to be present in the storm water discharges. Section A(7)(b) of the Storm Water Permit requires that the SWPPP include a summary of the areas of the facility that are likely sources of pollutants and the corresponding pollutants likely to be present in storm water discharges.

85.     Section A(8) of the Storm Water Permit requires that the SWPPP include a

1  narrative description of the storm water BMPs to be implemented at the facility for each

2  potential pollutant and its source. BMPs shall be developed and implemented to reduce or

3  prevent pollutants in storm water discharges. Storm Water Permit, Section A(8).

4  Dischargers must develop and implement structural and/or non-structural BMPs. *Id.*,

5  Sections A(8)(a) and (b).

6      86.    Section A(9) of the Storm Water Permit requires that the discharger evaluate

7  the SWPPP on an annual basis and revise it as necessary to ensure compliance with the

8  Storm Water Permit. Sections A(9)(a)-(c) of the Storm Water Permit require that the

9  discharger conduct an annual comprehensive site compliance evaluation that includes a

10  review of all visual observation records, inspection reports and sampling and analysis

11  results, a visual inspection of all potential pollutant sources for evidence of, or the

12  potential for, pollutants entering the drainage system, a review and evaluation of all

13  BMPs to determine whether the BMPs are adequate, properly implemented and

14  maintained or whether additional BMPs are needed, and a visual inspection of equipment

15  needed to implement the SWPPP. Section A(9)(d) of the Storm Water Permit requires

16  that the discharger submit an evaluation report that includes an identification of personnel

17  performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a

18  schedule for implementing SWPPP revisions, any incidents of non-compliance and the

19  corrective actions taken, and a certification that the discharger is in compliance with the

20  Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of

21  compliance cannot be provided, the discharger must explain in the evaluation report why

22  the facility is not in compliance with the Storm Water Permit. Id., Section A(9)(d). The

23  evaluation report shall be submitted as part of the Annual Report specified in Section

24  B(14) of the Storm Water Permit. *Id.*

25      87.    Section A(10) of the Storm Water Permit requires that the discharger revise

26  the SWPPP as necessary prior to changes in industrial activities, or as otherwise required

27  by the Storm Water Permit.

28

**D.     The Storm Water Permit's Monitoring and Reporting Requirements**

88.     Provision E(3) and Section B(1) of the Storm Water Permit require dischargers to develop and implement a Monitoring and Reporting Program ("M&RP") prior to commencing industrial activities.

89.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Sections B(2)(a) and B(2)(b).

90.     The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id*., Section B(2)(c) and B(2)(d).

91.     Section B(2)(d) requires that the M&RP "shall be revised" as necessary to ensure compliance with the Storm Water Permit.

92.     Section B(4)(a) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges during the first hour of discharge and at all discharge locations during the Wet Season (defined as October 1 – May 30).

93.     Section B(4)(c) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. This same section requires dischargers to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. Section B(4)(c) of the Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility.

94.     Sections B(5) and (7) of the Storm Water Permit require dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged.

95.     Section B(5)(a) requires discharges to sample during the first hour of discharge from the first storm event of the wet season and at least one other storm event during the Wet Season. All storm water discharge locations must be sampled. *See* Storm Water Permit, Section B(5)(a). Facility operators that do not collect samples from the first storm event of the wet season are still required to collect samples from two other storm events of the wet season and must explain in the Annual Report why the first storm event was not sampled. *See id.*

96.     Section B(5)(b) requires that sampling conducted pursuant to the Storm Water Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

97.     Section B(5)(c)(i) of the Storm Water Permit requires all covered dischargers to analyze each sample for pH, specific conductance, total suspended solids ("TSS"), and total organic carbon ("TOC"). A discharger may substitute analysis for oil and grease instead of TOC.

98.     Section B(5)(c)(ii) of the Storm Water Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

99.     Section B(5)(c)(iii) requires facilities to analyze for additional parameters listed in Table D of the Storm Water Permit, which are dependent on the Facility's SIC code.

100.   Table D of the Storm Water Permit requires facilities classified as Sector E (which includes SIC Codes beginning with 325), such as the Facility, to analyze storm water samples for aluminum, or as required by the Regional Board.

101.   Section B(14) of the Storm Water Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section

A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13).

## V.    FACTUAL BACKGROUND

### A.    The Facility's Storm Water Permit Coverage

102.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators filed a Notice of Intent to Obtain Coverage under the Storm Water Permit ("NOI") for its industrial operations in 1994.

103.   Waterkeeper is informed and believes, and thereon alleges, that the Mission Clay 1994 NOI identified the Owner/Operator of the Facility as "Mission Clay Product."

104.   Waterkeeper is informed and believes, and thereon alleges, that the Mission Clay 1994 NOI identified the address for the Owner/Operator of the Facility as P.O. Box 549, Corona, California 92878.

105.   The 1994 NOI lists the Facility WDID number as 833I011264.

106.   Waterkeeper is informed and believes, and thereon alleges, that the 1994 NOI identified the address for the Facility as 23835 Temescal Canyon Road, California 92878.

107.   Waterkeeper is informed and believes, and thereon alleges, that the Mission Clay 1994 NOI lists the Standard Industrial Classification codes of regulated industrial activity as 3251 (brick and structural clay tile).

108.   Waterkeeper is informed and believes, and thereon alleges, that the SIC code for clay mining- 1459- applies to the Facility.

109.   Waterkeeper is informed and believes, and thereon alleges, that storm water and non-storm water discharges from the Facility discharge to the Receiving Waters.

110.   Waterkeeper is informed and believes, and thereon alleges, that the Mission Clay 1994 NOI states that the Facility is 273 acres.

111.   Waterkeeper is informed and believes, and thereon alleges, that the Facility is approximately 283.88-293.92 acres in size.

**B.     Industrial Activities at the Facility**

112.   Waterkeeper is informed and believes, and thereon alleges, that the following industrial activities are conducted at the Facility: harvesting clay from the mining area; processing raw materials; blending clay with admixture; shaping clay; drying clay; firing clay in a kiln; sorting, unloading, loading, shipping, and storing finished or defective clay tile products and raw materials; storing of fuels and hazardous materials, such as diesel fuels, oils, gasoline, detergent, radiator coolant, petroleum contaminated soil; fueling, repairing, and overhauling and maintaining and storing vehicles; and vehicles leaving the Facility via driveways.

113.   Waterkeeper is informed and believes, and thereon alleges, that pollutants associated with operations at the Facility include, but are not limited to: toxic metals; aluminum; volatile organic compounds; sulfuric acid; surfactants; oil and grease; pH-affecting substances; petroleum hydrocarbons; and TSS.

114.   Waterkeeper is informed and believes, and thereon alleges, hazardous wastes such as oil, hydraulic fluid, transmission fluid, grease, antifreeze, and waste absorbent are stored at the Facility.

115.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' service and maintenance of heavy equipment at the Facility generate hazardous wastes.

116.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators conduct some or all of these industrial operations outdoors, without adequate cover to prevent storm water exposure to pollutant sources.

117.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators conduct industrial operations outdoors without sufficient secondary containment or other measures to prevent polluted storm water from discharging from the Facility.

118.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators store materials associated with their industrial activities outside

and without cover.

119.   Waterkeeper is informed and believes, and thereon alleges, that sediment, oil and grease, and other pollutants have been and continue to be tracked throughout the Facility.

120.   Waterkeeper is informed and believes, and thereon alleges, that these pollutants accumulate at clay grinding area, clay and pipe storage areas, loading and unloading areas, and parking lot(s).

121.   Waterkeeper is informed and believes, and thereon alleges, that trucks and vehicles entering and leaving the Facility via Ben Garrett Road are pollutant sources tracking sediment, dirt, oil & grease ("O&G"), metal particles, and other pollutants off-site.

122.   Waterkeeper is informed and believes, and thereon alleges, that sources of pollutants at the Facility include: trucks including off-site delivery trucks; equipment such as a grinder and kilns; admixture; batteries; paints; oils; fluorescent lights; antifreeze; soaps; propane tanks; hazardous waste and materials storage and disposal area(s); the clay stockpile area; broken clay pipe/fittings storage area; the steam cleaning/high pressure wash area; the mining area; shipping and receiving area(s); loading and unloading area(s); and office building(s).

123.   Waterkeeper is informed and believes, and thereon alleges, that the pollutants associated with operations at the Facility include, but are not limited to: heavy metals such as zinc, copper, lead, aluminum, and iron; pH-affecting substances; O&G; oils; solvents; paints; antifreeze; admixtures; TSS; sulfuric acid; petroleum hydrocarbons; and fugitive and other dust, dirt, and debris.

124.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners' and/or Operators' failure to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the discharge of polluted storm water from the Facility into Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

125.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners' and/or Operators' failure to develop and/or implement required BMPs also results in discharges of prohibited non-storm water from the steam cleaning and high pressure wash area in violation of the Storm Water Permit and the Clean Water Act.

126.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners' and/or Operators' failure to develop and/or implement required BMPs also results in prohibited non-storm water discharges when the Facility Owners and/or Operators use water as a dust suppressant.

127.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators have failed to adequately develop and/or implement BMPs to prevent the exposure of pollutants and their sources to storm water flows at the Facility.

128.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators have failed to adequately develop and/or implement BMPs sufficient to prevent polluted storm water from discharging from the Facility in violation of the Storm Water Permit and the Clean Water Act.

129.   The failure to properly address these pollutants and their sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from the Facility to the Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

### C.    Storm Water Discharge Points at the Facility

130.   Waterkeeper is informed and believes, and thereon alleges, that polluted storm water and prohibited non-storm water is discharged from the Facility to Receiving Waters via discharge points located throughout the Facility.

131.   Waterkeeper is informed and believes, and thereon alleges, that there are at least four (4) discharge points at the Facility: the three identified in the Annual Reports and at least one additional, unidentified discharge point.

132.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators collect storm water samples from one (1) or two (2) of the three (3) discharge points, identified as Outfall 1 and Outfall 2.

133.   Waterkeeper is informed and believes, and thereon alleges, that Outfall 1 is located at the entrance to the site, where Ben Garrett Road meets Temescal Canyon Road.

134.   Waterkeeper is informed and believes, and thereon alleges, that Outfall 2 is located in the northwestern portion of the mining area.

135.   Waterkeeper is informed and believes, and thereon alleges, a third discharge point located at the northwest corner of the Facility has not been identified as a discharge point from the Facility.

136.   Waterkeeper is informed and believes, and thereon alleges, that storm water samples are not collected from this third discharge point.

137.   Waterkeeper is informed and believes, and thereon alleges, that the remaining discharge point is located in the northeast corner of the mining area, near the portion of the railroad track that is across from the intersection of Dawson Canyon Road and Park Canyon Road.

138.   Waterkeeper is informed and believes, and thereon alleges, that the majority of the discharges from the Facility flow north to a municipal inlet on Temescal Canyon Road. These discharges enter the storm drain system, which connects to Coldwater Creek, which then joins the Temescal Creek.  Temescal Creek then flows into the Santa Ana River.

### D.   The Waters Receiving the Facility's Storm Water Discharges

139.   Waterkeeper is informed and believes, and thereon alleges, that Defendants discharge polluted storm water associated with industrial activities from the Facility during every significant rain event,[3] and any other time storm water discharges from the Facility.

---

[3] A significant rain event is an event that produces storm water runoff, which generally occurs with more than 0.1 inches of precipitation.

Complaint                                    22

140.   Waterkeeper is informed and believes, and thereon alleges, that pollutants discharge either directly to Receiving Waters or via the County of Riverside's or California Department of Transportation's storm drain system and into Receiving Waters.

141.   Waterkeeper is informed and believes, and thereon alleges, that the Receiving Waters into which the Facility discharges polluted storm water are waters of the United States.

142.   Waterkeeper is informed and believes, and thereon alleges, that the municipal storm drain system discharges to the Temescal Creek.

143.   Waterkeeper is informed and believes, and thereon alleges, that each of the surface waters into which the Facility discharges polluted storm water are tributaries to traditional navigable waters, such as the Santa Ana River.

144.   Waterkeeper is informed and believes that the Temescal Creek has a significant nexus to the Santa Ana River. Accordingly, the Temescal Creek is a water of the United States within the jurisdiction of the CWA as a result of having a significant nexus to traditional navigable waters. *See Rapanos*, 547 U.S. at 780-81.

145.   Polluted discharges from the Facility contribute to the degradation of the Santa Ana River, an impaired surface water, and aquatic dependent wildlife.

   **E.   The Storm Water Discharges at the Facility Contain Elevated Levels of Pollutants**

146.   Storm water discharges containing heavy metals such as copper adversely affect the aquatic environment.

147.   Samples of storm water collected at the Facility contain levels of pollutants, including TSS, aluminum, iron, copper, lead, and zinc, in excess of EPA Benchmarks.

148.   Waterkeeper is informed and believes, and thereon alleges, that repeated exceedances of EPA Benchmarks demonstrate Mission Clay has failed and continues to fail to develop and/or implement required BMPs at the Facility that achieve compliance with BAT/BCT standards in violation of Effluent Limitation B(3).

149.   Samples of storm water discharges collected at the Facility contain levels of

pollutants, including TSS, aluminum, iron, copper, lead and zinc, known to adversely impact aquatic species and the environment in excess of WQS.

150.  Waterkeeper is informed and believes, and thereon alleges, that discharges from the Facility containing levels of pollutants, including TSS, aluminum, iron, copper, lead, and zinc, known to adversely impact aquatic species and the environment demonstrate that Mission Clay Owners' and/or Operators' have violated and continues to violate Receiving Water Limitation C(1).

151.  Waterkeeper is informed and believes, and thereon alleges, that exceedances of WQS demonstrates that Mission Clay Owners' and/or Operators' have violated and continues to violate Receiving Water Limitation C(2).

152.  Waterkeeper is informed and believes, and thereon alleges, that during every significant rain event or any other storm water discharge that has occurred at the Facility since April 16, 2009 through the present, Facility Owners and/or Operators have discharged and continue to discharge storm water from the Facility that contains contaminants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the EPA Benchmarks, and WQS.

### F.    Defendants' Discharges of Prohibited Non-Storm Water Discharges

153.  Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators use water for dust control at the Facility, and that water from Facility Owners' and/or Operators' dust control discharges from the Facility to the Receiving Waters via the storm drain system.

154.  Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators use water for steam cleaning and high pressure washing at the Facility, and that water from Facility Owners' and/or Operators' steam cleaning and high pressure washing discharges from the Facility to the Receiving Waters via the storm drain system.

155.  Waterkeeper is informed and believes, and thereon alleges, that prohibited non-storm water discharges discharge from the Facility to the Receiving Waters in

violation of Discharge Prohibition A(1) when Facility Owners and/or Operators perform dust control.

156. Waterkeeper is informed and believes, and thereon alleges, that prohibited non-storm water discharges discharge from the Facility to the Receiving Waters in violation of Discharge Prohibition A(1) when Facility Owners and/or Operators perform steam cleaning and high pressure washing.

157. Waterkeeper is informed and believes, and thereon alleges, that the use of water for dust control is an ongoing business practice at the Facility.

158. Waterkeeper is informed and believes, and thereon alleges, that the use of water for steam cleaning and high pressure washing is an ongoing business practice at the Facility.

### G.   Defendants' Failure to Comply with the Storm Water Permit's SWPPP Requirements

159. Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed and continue to fail to develop an adequate SWPPP for the Facility that complies with Section A of the Storm Water Permit.

160. Waterkeeper is informed and believes, and thereon alleges, the Facility Owners and/or Operators failed and continue to fail to implement an adequate SWPPP for the Facility that complies with Section A of the Storm Water Permit.

161. The Facility Owners' and/or Operators' failure to develop an adequate site map for industrial operations at the Facility violates Section A(4) of the Storm Water Permit.

162. Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed and continue to fail to revise the SWPPP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections A(9) and A(10) of the Storm Water Permit.

### H.   Defendants' Failure to Comply with the Storm Water Permit's M&RP Requirements

163. Waterkeeper is informed and believes, and thereon alleges, that the Facility

Owners and/or Operators failed and continue to fail to develop an adequate M&RP for industrial operations at the Facility that complies with Section B of the Storm Water Permit.

164.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed and continue to fail to implement an adequate M&RP for industrial operations at the Facility that complies with Section B of the Storm Water Permit.

165.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed and continue to fail to revise the M&RP for the Facility as necessary to ensure compliance with the Storm Water Permit, in violation of Section B(2)(d) of the Storm Water Permit.

166.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed and continues to fail to collect two (2) samples from each of the Facility discharge points over the course of the wet season, as required by Sections B(15) and B(5)(a) of the Storm Water Permit.

167.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators failed and continues to fail to collect samples during the first storm event of the Wet Season over the past five years, in violation of Sections B(15) and B(5)(a) of the Storm Water Permit.

168.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed to visually observe storm water discharges during the first hour of discharge in violation of Section B(4)(a) of the Storm Water Permit.

169.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators have failed and continues to fail to collect samples of storm water discharges from each of the Facility's three (3) discharge points, in violation of Sections B(5), B(7), and B(15) of the Storm Water Permit.

170.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators have failed and continue to fail to analyze storm water samples

for all toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharges, including copper, lead, zinc, and iron, in violation of Section B(5)(c) of the Storm Water Permit.

171.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators failed and continue to fail to adequately revise the M&RP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections A(9) and A(10) of the Storm Water Permit.

## I.   Defendants' Failure to Comply with the Storm Water Permit's Reporting Requirements

172.   Waterkeeper is informed and believes, and thereon alleges, that since at least April 16, 2009 the Facility Owners and/or Operators have failed to submit Annual Reports that comply with Section B(14) of the Storm Water Permit.

173.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' certifications of compliance with the Storm Water Permit in each of its past five (5) Annual Reports were erroneous because the Facility Owners and/or Operators have not developed and/or implemented adequate BMPs, or revised the SWPPP or the M&RP, as required by Sections A and B of the Storm Water Permit.

174.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators failed to submit Annual Reports that contained explanations of their failures to implement activities required by the Storm Water Permit in 2010-2011 and 2012-2013, as required by Section B(14) of the Storm Water Permit.

175.   Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators failed to submit Annual Reports that contained adequate explanations of their failures to implement activities required by the Storm Water Permit in Annual Report years 2009-2010 and 2011-2012, as required by Section B(14) of the Storm Water Permit.

176.   Waterkeeper is informed and believes, and thereon alleges, that the Annual Report submitted for the 2009-2010 Wet Season was inaccurate because it indicated that

the first rain event of the 2009-2010 Wet Season was sampled, but, in fact, the Facility Owners and/or Operators failed to sample the first rain event of the 2009-2010 Wet Season, as required by Section B(5) of the Storm Water Permit, in violation of Sections C(9) and C(10) of the Storm Water Permit.

177. Waterkeeper is informed and believes, and thereon alleges, that the Annual Report submitted for the 2010-2011 Wet Season was inaccurate because it indicated that the first rain event of the 2010-2011 Wet Season was sampled, but, in fact, the Facility Owners and/or Operators failed to sample the first rain event of the 2010-2011 Wet Season, as required by Section B(5) of the Storm Water Permit, in violation of Sections C(9) and C(10) of the Storm Water Permit.

178. Waterkeeper is informed and believes, and thereon alleges, that the Annual Report submitted for the 2011-2012 Wet Season was inaccurate because it indicated that the first rain event of the 2011-2012 Wet Season was sampled, but, in fact, the Facility Owners and/or Operators failed to sample the first rain event of the 2011-2012 Wet Season, as required by Section B(5) of the Storm Water Permit, in violation of Sections C(9) and C(10) of the Storm Water Permit.

179. Waterkeeper is informed and believes, and thereon alleges, that the Annual Report submitted for the 2012-2013 Wet Season was inaccurate because it indicated that the first rain event of the 2012-2013 Wet Season was sampled, but, in fact, the Facility Owners and/or Operators failed to sample the first rain event of the 2012-2013 Wet Season, as required by Section B(5) of the Storm Water Permit, in violation of Sections C(9) and C(10) of the Storm Water Permit.

180. Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' Annual Reports are inaccurate because the Annual Reports list only three (3) discharge points at the Facility when, in fact, there are at least four (4) discharge points at the Facility, in violation of Sections C(9) and C(10) of the Storm Water Permit.

181. Waterkeeper is informed and believes, and thereon alleges, that for at least

the past five (5) wet seasons addressed in the Annual Reports, the Facility Owners' and/or Operators' failed to analyze and/or report storm water samples for all toxic chemicals likely to be present in the Facility's storm water discharges in significant quantities.

182. Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed to submit required reports when storm water discharges from the Facility exceed the Storm Water Permit Receiving Water Limitations identifying what additional BMPs will be implemented to achieve water quality standards, in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Defendant's Discharges of Pollutants Not in Compliance with an NPDES Permit in Violation of Section 301(a) of the Clean Water Act**

**33 U.S.C. §§ 1311(A), 1342, 1365(a) and 1365(f)**

183. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

184. Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have discharged, and continue to discharge, pollutants from a point source to a water of the United States not in compliance with an NPDES Permit in violation of Section 301(a) of the Clean Water Act.

185. Waterkeeper is informed and believes, and thereon alleges, that Facility Owners and/or Operators has discharged, and continues to discharge, pollutants from a point source to a water of the United States not in compliance with an NPDES permit in violation of section 301(a) of the CWA.

186. Every day pollutants are discharged from the Facility to a water of the United States not in compliance with an NPDES permit is a separate and distinct violation of the CWA.

Complaint                                              29

187.   Facility Owners and/or Operators violations of section 301(a) of the CWA are ongoing, and will continue each day point source discharges of pollutants occur from the Facility to the Receiving Waters.

188.   Mission Clay is subject to civil penalties for all violations of the CWA occurring since at least April 16, 2009.

189.   By committing the acts and omissions alleged above, Mission Clay is subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 16, 2009, to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2009).

190.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays judgment against the Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

191.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

192.   Waterkeeper is informed and believes, and thereon alleges, storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards has discharged and continues to discharge from the Facility.

193.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' discharges of storm water containing levels of pollutants that do not achieve compliance with the BAT/BCT occur during every storm water discharge

1    from the Facility.

2        194.   The Facility Owners and/or Operators violate Effluent Limitation B(3) of the

3    Storm Water Permit each and every time storm water containing levels of pollutants that

4    do not achieve BAT/BCT standards discharges from the Facility.

5        195.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

6    Owners' and/or Operators' violations of Effluent Limitation B(3) of the Storm Water

7    Permit and the CWA are ongoing and continuous.

8        196.   The Facility Owners and/or Operators will continue to be in violation of the

9    Storm Water Permit and the CWA each and every time contaminated storm water

10   discharges from the Facility in violation of Effluent Limitation B(3) of the Storm Water

11   Permit.

12       197.   Each and every time the Facility Owners and/or Operators discharge

13   contaminated storm water from the Facility in violation of Effluent Limitation B(3) of the

14   Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33

15   U.S.C. § 1311(a).

16       198.   By committing the acts and omissions alleged above, the Facility Owners

17   and/or Operators are subject to an assessment of civil penalties for each and every

18   violation of the CWA occurring from April 16, 2009 to the present pursuant to sections

19   309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2009).

20       199.   An action for injunctive relief under the CWA is authorized by 33 U.S.C.

21   § 1365(a). Continuing commission of the acts and omissions alleged above would

22   irreparably harm Plaintiff and the citizens of the State of California, for which harm

23   Waterkeeper has no plain, speedy, or adequate remedy at law.

24            WHEREFORE, Plaintiff prays for judgment against Defendants as set forth

25   hereafter.

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## THIRD CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

200.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

201.   Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that adversely impact human health and/or the environment has discharged and continues to discharge from the Facility.

202.   Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur during every storm water discharge from the Facility.

203.   The Facility Owners and/or Operators violation Receiving Water Limitation C(1) of the Storm Water Permit each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment discharge from the Facility.

204.   Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facility.

205.   Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards from the Facility occur during every storm water discharge from the Facility.

206.   Facility Owners and/or Operators violation Receiving Water Limitation C(2) of the Storm Water Permit each and every time storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards discharges

1  from the Facility.

2  207.   Waterkeeper is informed and believes, and thereon alleges, that Facility

3  Owners' and/or Operators' violations of Receiving Water Limitation C(1) of the Storm

4  Water Permit and the CWA from the Facility are ongoing.

5  208.   Waterkeeper is informed and believes, and thereon alleges, that Facility

6  Owners' and/or Operators' violations of Receiving Water Limitation C(2) of the Storm

7  Water Permit and the CWA from the Facility are ongoing.

8  209.   The Facility Owners and/or Operators will continue to be in violation of the

9  Storm Water Permit and the CWA each and every time contaminated storm water

10  discharges from the Facility in violation of Receiving Water Limitation C(1) of the Storm

11  Water Permit.

12  210.   The Facility Owners and/or Operators will continue to be in violation of the

13  Storm Water Permit and the CWA each and every time contaminated storm water

14  discharges from the Facility in violation of Receiving Water Limitation C(2) of the Storm

15  Water Permit.

16  211.   Each and every violation of Receiving Water Limitation C(1) of the Storm

17  Water Permit is a separate and distinct violation of Section 301 of the CWA, 33 U.S.C. §

18  1311(a).

19  212.   Each and every violation of Receiving Water Limitation C(2) of the Storm

20  Water Permit is a separate and distinct violation of Section 301 of the CWA, 33 U.S.C. §

21  1311(a).

22  213.   By committing the acts and omissions alleged above, the Facility Owners

23  and/or Operators are subject to an assessment of civil penalties for each and every

24  violation of the CWA occurring from April 16, 2009 to the present pursuant to Sections

25  309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2009).

26  214.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. §

27  1365(a). Continuing commission of the acts and omissions alleged above would

28  irreparably harm Plaintiffs and the citizens of the state of California, for which harm

Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Defendant's Discharges of Non-Storm Water in Violation of the Storm Water Permit's Discharge Prohibitions and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

215.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

216.   Waterkeeper is informed and believes, and thereon alleges, that prohibited non-storm water discharges have discharged and continue to discharge from the Facility in violation of Discharge Prohibition A(1) of the Storm Water Permit each time the Facility Owners and/or Operators use water for perform dust control that is not prevented from discharging from the Facility.

217.   Waterkeeper is informed and believes, and thereon alleges, that prohibited non-storm water discharges have discharged and continue to discharge from the Facility in violation of Discharge Prohibition A(1) of the Storm Water Permit each time the Facility Owners and/or Operators perform surface washing that is not prevented from discharging from the Facility.

218.   Waterkeeper is informed and believes, and thereon alleges, that prohibited non-storm water discharges have discharged and continue to discharge from the Facility in violation of Discharge Prohibition A(1) of the Storm Water Permit each time fugitive dust, dirt, and/or debris from the outdoor manufacturing process at the Facility is not prevented from discharging from the Facility.

219.   Waterkeeper is informed and believes, and thereon alleges, that prohibited non-storm water discharges have discharged and continue to discharge from the Facility in violation of Discharge Prohibition A(1) of the Storm Water Permit each time fugitive

dust, dirt, and/or debris from outdoor loading/unloading of clay at the Facility is not prevented from discharging from the Facility.

220.   Waterkeeper is informed and believe, and thereon alleges, that prohibited non-storm water discharges have discharged and continue to discharge from the Facility in violation of Discharge Prohibition A(1) of the Storm Water Permit each time the high pressure washers or steam is used to clean clay at the Facility that is not prevented from discharging from the Facility.

221.   Waterkeeper is informed and believe, and thereon alleges, that the Facility Owners' and/or Operators' of violations Discharge Prohibition A(1) are ongoing and continuous.

222.   The Facility Owners and/or Operators will continue to be in violation of the Storm Water Permit and the Clean Water Act each and every time non-storm water discharges discharge from the Facility to a water of the United States in violation of Discharge Prohibition (A)(1) of the Storm Water Permit.

223.   Each and every violation of Discharge Prohibition A(1) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

224.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 16, 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2009).

225.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**FIFTH CAUSE OF ACTION**
**Defendant's Failure to Adequately Develop, Implement, Review
and/or Revise a Storm Water Pollution Prevention Plan in Violation
of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

226.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

227.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately develop a SWPPP for the Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

228.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

229.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately revise a SWPPP for the Facility, in violation of Sections A(9) and A(10) of the Storm Water Permit.

230.   Defendants have been in violation of Section A and Provision E(2) of the Storm Water Permit at the Facility every day from April 16, 2009 to the present.

231.   The Defendants' violations of Section A and Provision E(2) of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

232.   The Facility Owners and/or Operators will continue to be in violation of Section A and Provision E(2) of the Storm Water Permit and the CWA each and every day that the Facility Owners and/or Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

233.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

234.   By committing the acts and omissions alleged above, the Defendants are

subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 16, 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2009).

235.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays for judgment against the Defendants as set forth hereafter.

## SIXTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Program in Violation of the
Storm Water Permit and Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

236.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

237.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately develop an M&RP for the Facility in violation of Section B and Provision E(3) of the Storm Water Permit.

238.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately implement an M&RP for the Facility in violation of Section B and Provision E(3) of the Storm Water Permit.

239.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed and continue to fail to adequately revise an M&RP for the Facility in violation of Section B and Provision E(3) of the Storm Water Permit.

240.   The Defendants have been in violation of the Section B and Provision E(3)

of the Storm Water Permit at the Republic Facilities every day from April 16, 2009 to the present.

241.   The Defendants' violations of Section B and Provision E(3) of the Storm Water Permit and the CWA at the Republic Facilities are ongoing and continuous.

242.   The Facility Owners and/or Operators will continue to be in violation of Section B and Provision E(3) the Storm Water Permit and the CWA each and every day they fail to adequately develop, implement and/or revise an M&RP for the Facility.

243.   Each and every violation of the Storm Water Permit's M&RP requirements at the Republic Facilities is a separate and distinct violation of the CWA.

244.   By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 16, 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2009).

245.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

        WHEREFORE, Plaintiff prays judgment against the Defendants as set forth hereafter.

## SEVENTH CAUSE OF ACTION
**Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

246.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

247.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed to submit accurate Annual Reports to the Regional

Board in violation of Sections C(9) and C(10) of the Storm Water Permit.

248.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' Annual Reports have not met the monitoring and reporting requirements of the Storm Water Permit in violation of Section B(14) of the Storm Water Permit.

249.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' Annual Reports were, and will continue to be, inaccurate and/or did not include complete annual comprehensive site evaluations in violation of Sections A(9) and B(14) of the Storm Water Permit.

250.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' Annual Reports were, and will continue to be, inaccurate in stating that the SWPPP's BMPs addressed existing potential pollutant sources when they did not, in violation of Storm Water Permit Sections A(6) and B(14).

251.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners' and/or Operators' Annual Reports failed and continue to fail to provide the explanations required by the Annual Report when there is non-compliance with the Storm Water Permit's terms, in violation of Section B(14) of the Storm Water Permit.

252.   Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners and/or Operators have failed to submit written reports identifying what additional BMPs will be implemented to achieve WQS even though the Facility's discharges exceeded receiving WQS, in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit.

253.   The Facility Owners and/or Operators have been in violation of the reporting requirements of the Storm Water Permit each day the Facility has operated without reporting as required by Section B(14) of the Storm Water Permit.

254.   The Facility Owners' and/or Operators' violations of the Reporting Requirements of the Storm Water Permit and the CWA are ongoing and continuous.

255.   The Facility Owners and/or Operators have been in daily and continuous

violation of Section B(14) of the Storm Water Permit every day since at least April 16, 2009.

256.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 16, 2009 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2009).

257.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays judgment against the Defendants as set forth hereafter.

## VII.    RELIEF REQUESTED

258.   Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court order declaring Defendants to have violated and to be in violation of the Storm Water Permit and Section 301(a) of the CWA, 33 U.S.C. §§ 1311(a), for their discharges of pollutants not in compliance with the Storm Water Permit and violations of the substantive and procedural requirements of the Storm Water Permit;

b.    A Court order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

c.    A Court order enjoining Defendants from discharging pollutants not in compliance with an NPDES permit;

d.    A Court order assessing civil monetary penalties for each violation of the CWA at $37,500 per day per violation for violations occurring since April 16, 2009, as permitted by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4 (2009);

e.    A Court order awarding Plaintiff it's reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

f.      Any other relief as this Court may deem appropriate.

Dated: June 24, 2014                    Respectfully submitted,

                                        Colin Kelly
                                        Attorney for Plaintiffs
                                        Orange County Coastkeeper
                                        Inland Empire Waterkeeper

Complaint                    41